# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ESPERANZA TORRES,

     Plaintiff,

v.                                                        No. 1:14-cv-00885-RB-KBM

CITY OF ALBUQUERQUE,
ALBUQUERQUE CITY POLICE OFFICERS
KEVIN SANCHEZ, ADRIAN MONTOYA,
MICHAEL FISHER, SGT. SEAN WALLACE,
and DET. D. PORTER,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on three Motions: a Motion for Summary Judgment by Albuquerque Police Officer Defendants Kevin Sanchez, Adrian Montoya, Michael Fisher, Sean Wallace, and Daniel Porter (collectively "APD Detectives") (Doc. 48); a Motion for Summary Judgment by the City of Albuquerque (Albuquerque) (Doc. 50); and Defendants' Motion for Separate Trials (Doc. 51).

Esperanza Torres filed suit against APD Detectives and Albuquerque alleging unreasonable seizure (Count I), excessive force (Count II), unreasonable detention (Count III), assault, battery, and false imprisonment (Count IV), and municipal liability (Count V).  (Doc. 1-1.)  Having reviewed the parties' submissions and arguments, the Court **GRANTS** the Motions as to Counts I, II, and III, and claims against Albuquerque in Count V for unreasonable seizure, excessive force, and unreasonable detention.   The Court **DIMISSES** Count IV and claims against Albuquerque for assault, battery, and false imprisonment without prejudice.

I.      **BACKGROUND**

   *A. Facts in Light Most Favorable to Ms. Torres*

On November 20, 2013, Emilio Marquez had two felony warrants for his arrest, one for aggravated burglary and one for tampering with evidence in connection to a homicide.  (Doc. 48-3.)  As members of the Gang Unit, APD Detectives knew that Mr. Marquez, nicknamed "Damage," was a Westside gang member.  (Doc. 48-1 at 5; Doc. 48-3.)  Mr. Marquez was also wanted for questioning by the FBI on multiple armed robberies.  (Doc. 48-1 at 5.)  Mr. Marquez previously ran away from two of the APD Detectives, and a gun was later found in the truck from which he fled.  (*Id.*; 58-3 at 5.)  During the course of the investigation to apprehend Mr. Marquez, APD Detectives received information from a confidential informant that Mr. Marquez carried a handgun and "never left home" without it.  (*Id.*)  According to the confidential informant, Mr. Marquez was staying with his family at a house in Albuquerque, New Mexico (*id.*) and may have had plans to flee to Clovis, New Mexico (Docs. 48-1 at 5; 48-8 at 2).

APD Detectives conducted surveillance at the family house.  (Doc. 48-1 at 5.)  While Detective Adrian Montoya watched the house, other APD Detectives were "set up in the area." (Doc. 58-8 at 4.)  Detective Montoya saw an unidentified man, later determined to be Mr. Marquez's stepfather Andrew Torres,[1] leave the house and get into a Chevy Camaro parked in the driveway.  (*Id.*; Docs. 48-1 at 5; 58-3 at 8.)  A little while later, another man left the house and Detective Montoya identified him as Mr. Marquez.  (*Id.*)  Detective Montoya's identification was the first visual confirmation that Mr. Marquez had been inside the house.  (Doc. 58-4 at 5; Doc. 75-4.)  Mr. Marquez "took some time" and may have gone back into the house to get something before he entered the Camaro.  (Doc. 58-3 at 8.)  APD Detectives did not attempt to

---

[1] Although Ms. Torres claims that APD Detectives "knew Andrew Torres to be Emilio's stepfather," she concedes that the APD Detectives did not know that the man who exited the house was Mr. Torres.  (*See* Doc. 58 ¶¶ W, Y.)

arrest Mr. Marquez at that time.  (Doc. 58-4 at 5.)  Instead, they followed the Camaro.  (Doc. 58-8 at 4.)  As they were driving, there was a call to initiate a Vehicle Blocking Maneuver (VBM) at an intersection.  (*Id.*; Doc. 58-2 at 1.)

At this point, a pause in the narrative is warranted to provide a short explanation of a VBM and APD policy surrounding the maneuver.  In a VBM, a minimum of four undercover vehicles block all four sides of a target vehicle to prevent occupants from fleeing.  (Docs. 58-2 at 2; 58-6 at 5.)  When the target vehicle is at a stop (Doc. 65-5 at 4), the front undercover vehicle initiates the VBM by stopping to prevent the target vehicle from moving.  (Doc. 58-6 at 5.)  Then, the rear undercover vehicle blocks the target vehicle by "tap[ping] the rear bumper of the target [vehicle]."  (*Id.*)  The other two undercover vehicles stop at the sides of the target vehicle to "pinch the driver's side and passenger" doors of the target vehicle.  (*Id.*)  In a "hard block," as opposed to a "soft block," the undercover vehicles make contact with the sides of the target vehicle, as well as the front and back of the target vehicle.  (Doc. 50-3 at 10.)  Once the suspect's vehicle is blocked, detectives exit their vehicles (Doc. 58-6 at 5), draw firearms and non-lethal options (Docs. 58-2 at 4), command each of the passengers to exit one at a time (Doc. 58-6 at 5), and typically handcuff each passenger upon exit (Doc. 58-8 at 2).  Once the vehicle is "deemed clear," the detectives lower their weapons.  (*See* Doc. 58-8 at 8.)

At the time of the VBM at issue, the APD Special Investigations Division had a written policy for "The Use of Department Vehicles in Undercover Operations; Vehicle Blocking Maneuvers (VBM)."  (Doc. 50-1.)  According to APD policy, a VBM is a distraction tactic, (Doc. 58-2 at 2), which puts the offender "in a position of shock" so they do not have time to react violently to police officers (Doc. 58-6 at 3).  Only detectives in the Special Investigation Division, of which the Gang Unit is a part, may use VBMs.  (*Id.* at 4.)  Detectives must also

receive training and practice before using VBMs.  (Doc. 50-1 at 2.)  APD provides six hours of

practical field instruction and two hours of classroom instruction to train detectives on VBM use.

(Doc. 50-2.)  Moreover, detectives may only utilize a VBM (a) where "[p]robable cause exists

that the vehicle contains a violent felony suspect"; (b) "to prevent pursuit during the

apprehension of a felony suspect"; (c) to protect innocent bystanders; or (d) with supervisor

approval for a misdemeanor suspect.  (Doc. 58-6 at 2.)

Detectives must also pay careful attention to the "individual facts and circumstances of

each case" before initiating a VBM.  (Doc. 50-1 at 1.)  To evaluate the circumstances, detectives

must consider:

a. The severity of the crime(s) of those individuals under investigation[;]
b. Whether or not the suspect poses an immediate threat to the health and safety of themselves or others[;]
c. Whether the suspect is actively resisting arrest or attempting to evade arrest by flight[;]
d. The criminal history of the offender[;]
e. The presence of children within the suspect's vehicle[;]
f. The size and weight of the suspect's vehicle[;]
g. Environmental Conditions [sic] [;]
h. Alternate methods of apprehension[; and]
i. The presence of the minimum number of certified officers that can be used to carry out the VBM safely.

(*Id.* at 1–2.)  Neither APD policy nor training materials define the term "children."  (*See* Docs.

50-1 at 1–2; 50-3 at 2–3.)  Beyond consideration of children, elderly, and pregnant passengers,

APD does not train detectives to consider whether a vehicle is occupied by both a suspect and

non-suspects.  (Docs. 65-1 at 4; 65-2 at 7; 65-3 at 7; 65-6 at 3.)  However, pursuant to

Albuquerque Police Department training, any team member involved in the VBM can call off the

block if the member thinks it is unsafe or the member is unable to get into position. (Doc. 50-4 at

1.)

4

Earlier in 2013, APD Lieutenants and Commanders approved two other VBMs initiated by the Gang Unit to apprehend suspects with felony warrants while non-suspects were also in the target vehicle.  (*See* Doc. 65-8 at 2–3 (explaining use of VBM based on a warrant for a single subject, but stating that multiple subjects complied).)  Although no information exists on damage to the target vehicles, the first incident only caused minimal damage to one undercover vehicle (*id.* at 2), and the second VBM made "no contact" with the target vehicle (*id.* at 3).  There is no evidence that either of these incidents resulted in complaints.  Other evidence indicates that one of the detectives had previously been deposed for "another VBM lawsuit several years ago." (Doc. 58-6 at 6.)  However, no evidence exists as to the circumstances of that incident or the outcome of the litigation.

Returning to the scene of the incident, before APD Detectives initiated the VBM at the intersection, one of the APD Detectives called off the VBM due to safety concerns.  (Doc. 58-8 at 4, 8.)  The Camaro then turned into a short cul-de-sac and parked in the driveway of another house.  (Docs. 48-1 at 5; 58-8 at 4.)  At least one of the APD Detectives did not believe it was possible to get into position to conduct a VBM while the car was parked at the house.  (*Id.*)  Mr. Torres honked the horn and an unidentified female left the house.  (Doc. 48-1 at 5.)  APD Detectives later determined that the female was Mr. Marquez's sister and Mr. Torres's daughter, Esperanza Torres (*id.*), who was 16 years-old at the time (*see* Doc. 49; Ex. G at 15:54:18–26). Mr. Marquez got out of the passenger's seat to allow Ms. Torres to enter the back seat and then got back into the front passenger's seat.  (Doc. 48-1 at 5.)  The Camaro left the house and stopped near an intersection.  (*Id.*)

At this point, APD Detectives initiated a VBM.  (Doc. 48-1 at 5.)  The APD Detectives who initiated the VBM had all received the APD training.  (Docs. 50-5; 50-6 at 1–2; 50-7; 50-8;

50-9.)   APD Detectives chose to use a hard block VBM because of Mr. Marquez's "gang affiliation, violent criminal history, and . . . [APD Detectives'] belie[f] that he was armed and likely to flee."   (*See* Doc. 49; Ex. G at 15:28-50–29:00; Doc. 48-4 at 2.)   The APD Detectives did not believe that Ms. Torres had committed a crime.   (Docs. 65-1 at 5; 65-3 at 8.)   Based on testimony, pictures, and police lapel video, it was or had been raining and the street was wet. (Docs. 48-2 at 3; 48-10 at 2, 4; *see* Doc. 49; Ex. G. 15:33:27–30.)   As APD Detectives later discovered, the VBM occurred near Ms. Torres's high school.   (*See* Doc. 49; Ex. G. at 15:38:27–30 (explaining she was on her way to a meeting at school).)

Eight undercover vehicles were present for the operation.   (Doc. 58-7.)   The undercover vehicles did not have sirens or other identification.   (Doc. 58-8 at 6.)   APD Detectives had facial hair and wore casual clothing; however, they all wore Police Gang Unit vests with markings on the front and back when they exited their undercover vehicles.   (Exs. G at 15:33:32–53; B at 0:31–45.)   When APD Detectives exited their vehicles, four of them pointed weapons at the Camaro to cover and clear it.   (Doc. 48-1 at 2; *see also* Doc. 59; Ex. B at 9:24–12:29.)   Sergeant Wallace pointed an AR-15 rifle at the Camaro, Detective Fisher pointed a M26 Air Taser at the Camaro, Detective Sanchez pointed a Mossberg Taser Shotgun at the Camaro, and Detective Porter pointed a department-issued handgun at the Camaro.   (Docs. 48-1 at 2; 58-8 at 7.)   Sergeant Wallace held his AR-15 rifle at "high low ready," "just below the . . . target" and "in the direction of the driver's side door . . . ."   (Doc. 58-4 at 10).   Mr. Torres, Mr. Marquez, and Ms. Torres were each ordered out of the Camaro, each from the driver's side window one at a time.   (*See* Doc. 49; Ex. G. at 15:34:18–15:36:20)   Mr. Torres, Mr. Marquez, and Ms. Torres were all handcuffed upon exiting the Camaro.   (Doc. 58-4 at 10.)   Detective Victor Hernandez, not a party to this suit, handcuffed Ms. Torres.   (Doc. 58-6 at 8; *see* Doc. 49; Ex. G at 15:34:38–

15:36:20.)  All of the occupants of the Camaro "were very compliant" as they exited the vehicle. (Doc. 58-6 at 2.)  Once APD Detectives deemed the vehicle clear and checked Mr. Torres and Ms. Torres's identities, APD Detectives removed their handcuffs.  (Doc. 58-4 at 10.)  The incident, from initiation of the VBM to removing the handcuffs lasted approximately four minutes and thirty-seven seconds.  (*See* Doc. 49; Ex. G at 15:32:24–15:37:01.)  Ms. Torres was in handcuffs for approximately two minutes and seven seconds.  (*Id.* at 15:34:54–15:37:01.)

During the incident, Ms. Torres's hands went numb.  (Doc. 58-11.)  Her right wrist hurt and the handcuffs left red and purple marks on her wrists.  (Docs. 48-9 at 3; 58-11 at 3.)  Ms. Torres also became nauseous, experienced chest pain and tightness, and suffered a "severe anxiety panic attack until her mother arrived . . . ." (*Id.*)  After Ms. Torres was uncuffed, she was "visibly upset so rescue was started for her."  (Doc. 58-4 at 10.)  Detective Fisher noticed Ms. Torres was "having a hard time breathing" and was "hyperventilating very hard."  (Doc. 58-6 at 8.)  She had stopped breathing and her hands were going numb.  (*Id.*)  While Detective Fisher was trying to get her to calm down, she asked, "Is this because [Mr. Marquez]'s got warrants?" (*Id.* at 10.)  Ms. Torres also expressed concern that people near the incident would see her.  (*See* Doc. 49; Ex. G at 15:39:59–40.)  APD Detectives stepped in front of her and put up her sweatshirt hood to keep her from view.  (*Id.* at 15:40:00–11.)  Rescue arrived to inspect Ms. Torres approximately 22 minutes after the VBM was initiated.  (*Id.* at 15:32:24–54:18.)

After the incident, Ms. Torres's wrists were bruised and she had to receive a cortisone injection to treat joint pain and nerve damage.  (Doc. 58-11 at 3.)  She faces possible surgery to relieve the pain in her right wrist.  (*Id.*)

### B. Procedural History

Mr. Torres and Ms. Torres's mother, on behalf of Ms. Torres who was then a minor, sued Albuquerque and APD Detectives on August 5, 2014, in state court. (Doc. 1-1 at 1.) The case was later removed to federal court (Doc. 1), and Ms. Torres was replaced as a party on her own behalf on February 18, 2015 (Doc. 36). Mr. Torres later settled his dispute with all parties. (Doc. 69.) Ms. Torres asserts that APD Detectives unreasonably seized her by stopping the Camaro (Doc. 1-1 at 5), unreasonably detained her by conducting the VBM (*id.* at 6), applied excessive force in conducting the VBM, holding her at gunpoint, and handcuffing her (*id.* at 5–6), and committed assault, battery, and false imprisonment by using a VBM to stop the Camaro, pointing weapons at her, and handcuffing her (*id.* at 12). Ms. Torres asserts that Albuquerque's policy to allow VBMs on target vehicles with non-suspect occupants "shows deliberate indifference to the rights of citizens" and was a moving force in the deprivation of Ms. Torres's civil rights. (Doc. 1-1 at 8.) Ms. Torres further claims that Albuquerque trained its officers to conduct such VBMs, "transforming an arrest of a person who has a warrant into invasive seizures" of other non-suspects. (*Id.*)

## II.   LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To apply this standard, courts "examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 875 (10th Cir. 2009). Typically, the movant bears the initial burden to show that no genuine issue of material fact exists. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If shown, the burden shifts to the non-movant to present evidence showing a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  Mere allegations or denials based on the pleadings are insufficient to avoid summary judgment.  *Id.*

"Generally, failure to set forth in the complaint a theory upon which the plaintiff could recover does not bar a plaintiff from pursuing a claim."  *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1122 (10th Cir. 2005).  A court may allow a plaintiff to change a theory of recovery as long as the plaintiff does not "wait until the last minute" and in so doing "prejudice the other party in maintaining its defense."  *Id.*  Prejudice is likely to occur where the plaintiff attempts to assert "an entirely new factual basis for relief" not previously included in the case.  *Id.*

## III.    DISCUSSION

### A.  Unreasonable Seizure and Unreasonable Detention Against Both APD Detectives and Albuquerque

Ms. Torres asserts separate counts for "unreasonable seizure" and "unreasonable detention" against APD Detectives (Doc. 1-1 at 5, 6–7) and alleges municipal liability for both claims against Albuquerque (*see id.* at 8).  However, neither party proffers any legal or factual distinction between "unreasonable seizure" and "unreasonable detention."  (*See* Docs. 1-1 at 5, 6–7; 48 at 11–18; 58 at 15–31.)  Indeed, the Court can discern only one claim, brought against both APD Detectives and Albuquerque, based on these counts: arrest without probable cause or, in the alternative, detention without reasonable suspicion.  *See Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1307 n.3 (10th Cir. 2015) (joining claims for unreasonable seizure and unlawful detention).

**B. Section 1983 Claims Against APD Detectives**

*i.  Absolute or Quasi-Judicial Immunity*

42 U.S.C. § 1983 holds government defendants liable where defendants "subjected or caused to be subjected, any citizen . . . or other person . . . to the deprivation of any rights" guaranteed by federal law.   However, § 1983 does not eliminate "traditional common-law protections extended to the judicial process." *Forrester v. White*, 484 U.S. 219, 225 (1988). Quasi-judicial immunity attaches to judicial functions, not specific positions.   *Id.* at 227. However, the Supreme Court has been " 'quite sparing' in recognizing absolute immunity for state actors" based on this functional analysis.  *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (quoting *Forrester,* 484 U.S. at 224).

In § 1983 actions, "an official charged with the duty of executing a facially valid court order enjoys absolute immunity from liability for damages in a suit challenging conduct prescribed by that order." *Valdez v. City & Cty. of Denver*, 878 F.2d 1285, 1286 (10th Cir. 1989).  Courts recognize this immunity because officials executing court orders should not be put "in the position of having to choose between disregarding the judge's orders and facing discharge, or worse yet criminal contempt, or fulfilling their duty and risking being haled into court." *Turney v. O'Toole*, 898 F.2d 1470, 1474 (10th Cir. 1990) (internal quotations marks omitted) (alterations omitted).  To qualify for this special immunity, "the officials must only act as prescribed by the order in question."  *Moss v. Kopp*, 559 F.3d 1155, 1163 (10th Cir. 2009). Indeed, "absolute immunity does not protect defendants from damage claims directed not to the conduct prescribed by the court order itself, but to the manner of the order's execution."  *Id.* at 1167–68 (determining that a "single statement" by an officer who threatened to "kick in" the plaintiff's door was not sufficiently excessive to exceed the acts prescribed by the court order);

*see also Turney*, 898 F.2d at 1474 (determining that absolute immunity did not protect defendants authorized to "confine" plaintiff when they placed the plaintiff in a maximum security ward).  Holding otherwise would surely allow the exception, quasi-judicial immunity, to swallow the rule, § 1983 liability.

In this case, although the warrants commanded officers to arrest Mr. Marquez and bring him before the court "without unnecessary delay" (Doc. 48-3 at 2, 5), the warrants did not address detention of other individuals or authorize unlimited force to arrest Mr. Marquez.  While APD Detectives had to follow the judge's orders or face discharge and perhaps criminal contempt, APD Detectives had discretion in determining the "manner of the order's execution." *See Moss*, 559 F.3d at 1163.  The APD Detectives decided to conduct a VBM.  (Doc. 48-4 at 2.) The Albuquerque Police Department required APD Detectives to consider "[a]lternate methods of apprehension," including a vehicle stop and apprehension by foot, before making that decision.  (*See* Doc. 58-2 at 2–3.)  The decision to employ this specialized tactic, available only to the Special Investigation Division (Doc. 58-6 at 4), and seize other individuals in the process exceeded the order to simply arrest Mr. Marquez.  Whereas APD Detectives may seek protection through qualified immunity, their decision to seize Ms. Torres in the process of arresting Mr. Marquez is not protected by quasi-judicial immunity.

### ii. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).  To determine whether qualified immunity applies, courts consider two questions.  *Id.* at 236.  First, did the defendants' actions violate the

plaintiff's constitutional rights?  *See id.*  Second, was the complained-of constitutional violation "clearly established," such that a reasonable officer would have known his conduct was unlawful?  *See Saucier v. Katz*, 533 U.S. 194, 202 (2001).

"[I]n order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Medina v. City and Cty. of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).  As such, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law.' "  *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001).  Although a plaintiff need not always show that "the very conduct in question has previously been held unlawful," the plaintiff must "demonstrate the unlawfulness was apparent in light of established law."  *Sh.A. ex rel. J.A. v. Tucumcari Mun. Sch.*, 321 F.3d 1285, 1287 (10th Cir. 2003) (internal quotation marks omitted). To do so, the plaintiff must generally "demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited."  *Id.*  (internal quotation marks omitted).

Notably, the plaintiff has the burden to show that the defendants are not protected by qualified immunity.  *Mecham v. Frazier*, 500 F.3d 1200, 1204 (10th Cir. 2007). Notwithstanding this burden, courts still consider the facts in the light most favorable to the plaintiff.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).  And the defendant must still show that no disputed material facts exist.  *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) ("If the plaintiff successfully establishes the violation of a clearly established right, the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.") (internal quotation marks omitted).

12

      *a.   Counts I and III, Reasonableness of Seizure and Detention*

          1.   The stop was not an arrest.

"[T]he Supreme Court has identified three types of police/citizen encounters: consensual encounters, investigative stops, and arrests."  *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007).  To conduct an investigative stop, police officers must have reasonable suspicion.  *Id.* at 1123.   Reasonable suspicion exists where the totality of the circumstances "form a particularized and objective basis for a stop."  *Poolaw v. Marcantel*, 565 F.3d 721, 736 (10th Cir. 2009), *as amended* (July 24, 2009) (internal quotation marks omitted).   As such, reasonable suspicion requires "something more than an inchoate and unparticularized suspicion or hunch . . . ."  *United States v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994) (internal quotation marks omitted).   However, if one officer has sufficient information to detain an individual and instructs other officers to act, the original officer's information justifies the other officers' actions.  *See United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008) (discussing probable cause for arrest).

     An investigative stop is constitutional if the seizure was justified at its inception and the seizure remained "limited in scope to the justification for the stop."  *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993).   "An investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification."  *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997).   "An arrest is distinguished [from an investigative stop] by the involuntary, highly intrusive nature of the encounter."  *Cortez*, 478 F.3d at 1115.   If the manner of seizure encroaches an individual's freedom beyond the limits of an investigative stop, it must be justified either by probable cause for an arrest, or consent.  *Perdue*, 8 F.3d at 1462.

However, in circumstances where police officers have "reason to be concerned for their safety[,]" they may "take reasonable steps to protect themselves." *Perdue*, 8 F.3d at 1463. " '[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest.' " *United States v. Merritt*, 695 F.2d 1263, 1272 (10th Cir. 1982) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). Hence, whereas the "use of firearms, handcuffs, and other forceful techniques generally exceed [sic] the scope of an investigative detention and enter the realm of an arrest," *Cortez*, 478 F.3d at 1115–16, such limitations do not apply where "officers ha[ve] reason to be concerned for their safety," *Melendez-Garcia*, 28 F.3d at 1052. These forceful techniques may be warranted during an investigatory stop "to protect [a police officer's] personal safety and to maintain the status quo during the course of [an investigative] stop." *Id.* (internal quotation marks omitted). However, "[p]ointing a firearm directly at a child calls for even greater sensitivity to what may be justified" under the circumstances. *Holland*, 268 F.3d at 1193.

In *Perdue*, 8 F.3d 1455, the court noted a "recent trend allowing police to use handcuffs or place suspects on the ground during a[n investigative] stop." *Id.* at 1463. In that case, police officers were searching a warehouse and discovered marijuana plants and firearms in the building. *Id.* at 1458. During the search, two police officers observed a vehicle drive slowly down the rural road to the warehouse and then reverse once the police were visible. *Id.* The police drew their firearms, ordered a man and his pregnant fiancé out of their vehicle, commanded the man to lie on the ground, and handcuffed him. *Id.* The court determined that the police officers reasonably acted to protect themselves because the officers knew that firearms and marijuana had been found on the property. *Id.* at 1462–63. Consequently, the officers' use of firearms and handcuffs did not transform the investigatory stop into an arrest. *Id.* at 1463; *see*

*also Muehler v. Mena*, 544 U.S. 93, 100 (2005) (noting that factors such as one individual's gang membership, multiple passengers in a vehicle, and potential presence of firearms can create increased danger for police officers). In such cases, a more forceful manner of seizure may be necessary "to minimize the risk of harm to both officer" and the public. *Muehler*, 544 U.S. at 100.

In *Merritt*, 695 F.2d 1263, the court determined that a seizure was an investigatory stop when police ordered three individuals out of a truck at gunpoint and continued to point a rifle directly at one of the individuals after he exited the truck, moved to the rear of the truck, and waited while the truck was searched. *Id.* at 1272–74. The court determined that the police had reasonable suspicion that one of the individuals was a murder suspect and that he was armed and dangerous, and reasoned that the police officers consequently "acted properly when they ordered [the individual] and his colleagues out of the truck." *Id.* at 1273. The court further determined that, because the police officers had reasonable suspicion that "at least one of the occupants of the truck might be heavily armed and dangerous, [the police officers] acted reasonably in holding shotguns on the suspects during the course of the stop." *Id.* The court concluded that "[t]o otherwise constrain the police in such situations would subject them to unreasonable risks, and seriously hamper their efforts to apprehend dangerous criminal suspects." *Id.* at 1274.

Conversely, in *Melendez-Garcia*, 28 F.3d 1046, the court determined the officer's use of firearms and handcuffs was unreasonable and transformed the investigative stop into an arrest. *Id.* at 1153. There, the police officer stopped two cars suspected of drug trafficking. *Id.* at 1052. The officers drew their firearms and pointed them at the vehicles, ordering the driver to throw the keys out the window and then commanding each occupant out of the car one at a time. *Id.* at 1050. The court determined that the firearms and handcuffs were unreasonable because the

police officers had no evidence or testimony that the suspects had firearms or were violent. *Id.* at 1052–53. As such, the government provided "no reasons why the circumstances of the stop reasonably necessitated the display of firearms and the use of handcuffs." *Id.* at 1052.

Similarly, two police officers arrested, rather than detained, two parents and their three children in *Maresca*, 804 F.3d 1301 when they pulled them over a due to a mistaken stolen vehicle identification. The police officers ordered the family out of their vehicle one by one at gunpoint, forced them to lie face down on the highway, handcuffed them, and locked them each in separate patrol cars. *Id.* at 1304–1307, 1309. The court noted that the duration of the detention, between seven and fifteen minutes, suggested that the stop was "more than a limited intrusion lasting no longer than is necessary to effectuate the purpose of the stop." *Id.* at 1309 (internal quotation marks omitted). The court also highlighted the "intrusion on the [plaintiffs'] dignity" when the police officers ordered the family, including the nine year-old daughter, to lift their shirts to show they carried no weapons and then forced the family to lie on the highway in prone position "in view of other motorists and the officers themselves." *Id.* The plaintiffs fully cooperated with all orders and the police officers had no indication that the plaintiffs were "armed and dangerous." *Id.* at 1310. Based on these facts, the court determined that the stop had transformed to an arrest. *Id.*

The parties here agree that Ms. Torres was seized. (Doc. 58-1 at 8.) The issue is whether the seizure was sufficiently intrusive to constitute an arrest rather than an investigative stop. *See Cortez*, 478 F.3d at 1115. Based on the situation, the APD Detectives' use of firearms and handcuffs was reasonable to protect the officer's safety. Mr. Marquez was wanted on two felony warrants, one for aggravated burglary and one for tampering with evidence in connection to a homicide. (Doc. 48-3.) Perhaps even more than the suspects in *Perdue*, APD Detectives had

reason to believe that at least Mr. Marquez was armed and dangerous. He was wanted for questioning regarding an armed robbery, he was known never to leave home without his handgun, and his nickname was "Damage."  (Doc. 48-1 at 5.)  Unlike *Melendez-Garcia*, APD Detectives also had reason to believe that the other passengers may have been armed or dangerous.  Since Mr. Marquez was a Westside gang member (*id.*), APD Detectives could reasonably be concerned that the other passengers were also affiliated.  *See also Muehler*, 544 U.S. at 100.  Since APD Detectives believed Mr. Marquez was planning to flee to Clovis, APD Detectives could reasonably have been concerned that the others were involved and would react violently to an attempt to arrest Mr. Marquez.  (*See* Docs. 58-8 at 8; 75-1 at 2.)

Perhaps most importantly, the detention differed from that in *Maresca* in several notable ways.  As discussed above, APD Detectives had reason to believe that individuals in the car could be armed and dangerous.  Unlike the children in *Maresca*, Ms. Torres was never forced to the ground.  She was not asked to lift her shirt.  Ms. Torres was never placed in the back of a police car, let alone a locked police car.  Whereas the stop in *Maresca* lasted between seven and fifteen minutes, this VBM and handcuffing lasted no more than four minutes and thirty-seven seconds (*See* Doc. 49; Ex. G at 15:32:24–15:37:01), including the two minutes and seven seconds Ms. Torres was handcuffed (*see* Doc. 49; Ex. G at 15:34:54–15:37:01).  APD Detectives did not use firearms or handcuffs any longer than necessary to determine that Ms. Torres was not a threat.  (Doc. 58-4 at 10.)  APD Detectives acted to avoid intrusion on Ms. Torres's dignity after the stop by standing in front of her and placing her sweatshirt hood up to keep her from view of students leaving school.  (*See* Doc. 49; Ex. G at 15:40:00–11.)  As such, the firearms and handcuffs did not elevate the detention to an arrest, and APD Detectives needed only reasonable suspicion to conduct the stop.

17

    2.  APD Detectives had reasonable suspicion to detain the Camaro and its occupants to insure officer and public safety.

A "person's mere propinquity to others independently suspected of criminal activity, creates neither probable cause nor reasonable suspicion . . . ." *Poolaw*, 565 F.3d at 737 (internal quotation marks omitted) (alterations omitted); *see also Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). In *Poolaw*, a judge granted a search warrant for a house occupied by the parents of a suspect's girlfriend, or spouse, who was pregnant with the suspect's child. *Poolaw*, 565 F.3d at 726–27. The sole evidence presented to the judge was an affidavit asserting that the girlfriend had stayed with her parents on the night the crime occurred and uncharacteristically missed work the following day. *Id.* 726–27. The court determined that even if this information established a reasonable assumption that the girlfriend was staying at her parent's home temporarily, that conclusion did not imply that the suspect was also staying there. *Id.* at 730–31. The mere familial connection could not establish probable cause for a search of the in-laws' home. *Id.* at 730. In *Ybarra*, police searched the individual because he "was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale." *Ybarra*, 444 U.S. at 91. The court determined that the search was unreasonable because the police officers "knew nothing in particular about" the individual searched. *Id.* In both cases, the complaining parties challenged searches, not seizures during detention of a nearby suspect, and the police expressed no concerns that the third parties might interfere with their pursuit of the suspect.

Conversely, police officers may detain a non-suspect while in pursuit of certain suspects. In *Holland*, 268 F.3d 1179, the court determined that occupants of a home were seized when a SWAT team entered the house to arrest a person for a misdemeanor warrant for assault and reckless endangerment, but held that the police officers who planned the tactic were entitled to

summary judgment even though the police officers were aware that other residents resided on the property. *Id.* at 1187–88, 1191–92. Similarly, where a seizure involves a vehicle with multiple occupants, police may detain the vehicle based on a reasonable suspicion that one of the occupants is a suspect of a violent crime. *See United States v. Lang*, 81 F.3d 955, 965 (10th Cir. 1996) (holding that an investigatory stop was justified where police detained two occupants because they believed the passenger was a suspect for two robberies and a robbery/murder); *see also United States v. Helton*, 232 F. App'x 747, 750 (10th Cir. 2007) (determining that a police traffic stop was reasonable where police believed the passenger had a warrant for her arrest).

In addition, "[t]he Supreme Court has recognized that detention or control of both suspects and non-suspects may be necessary to insure officer safety . . . ." *Walker v. City of Orem*, 451 F.3d 1139, 1149 (10th Cir. 2006) (discussing detention to maintain a crime scene and noting that "detention of non-suspects incidentally present on the scene, in the interest of officer safety, should not ordinarily exceed in scope or duration that of the suspects directly targeted by the [investigative] stop itself"). Indeed, "a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993). Where public or individual safety is at risk, police officers need only show "specific and articulable facts which reasonably warrant an intrusion into the individual's liberty." *Id.* (internal quotation marks omitted) (alterations omitted).

In this case, APD Detectives did not detain Ms. Torres merely because she was related to Mr. Marquez. APD Detectives detained Ms. Torres, like the driver in *Lang*, because they sought to detain Mr. Marquez. *See Lang*, 81 F.3d at 955. APD Detectives had probable cause to arrest

Mr. Marquez.  (*See* Doc. 48-3.)  As discussed previously, APD Detectives used their firearms and handcuffs to detain Ms. Torres out of concern for their own safety in apprehending Mr. Marquez.  *See supra* at III(B)(ii)(a)(1).  Mr. Marquez had two felony warrants, one for aggravated burglary and another in connection with a homicide.  (Doc. 48-3.)  He was a gang member and went by the nickname "Damage."  (Doc. 48-1 at 5; Doc. 48-3.)  APD Detectives consequently had reason to be concerned about the public's safety in apprehending Mr. Marquez and were justified in detaining other subjects in order to safely apprehend Mr. Marquez.

   *b.  Count II, Excessive Force*

   Excessive force claims present "a discrete constitutional violation relating to the manner in which [a seizure] was carried out" and as such are independent from claims of unreasonable seizure or detention.  *Cortez*, 478 F.3d at 1127 (internal quotation marks omitted).[2]  For excessive force claims, courts consider whether the force used exceeded the force reasonably necessary to seize the individual under the circumstances of the case.  *Id*. at 1126; *Maresca*, 804 F.3d at 1313.  Courts apply a "test of reasonableness" based on the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The reasonableness of force also depends on "individual dignity interests, particularly of non-suspects . . . ."  *Cortez*, 478 F.3d at 1131.  "These interests are particularly vulnerable when the officers' use of force is directed at children . . . ."  *Maresca*, 804 F.3d at 1313.

---

[2] Perhaps a simpler analysis would result from a unified approach that considers in one claim both the reasonableness of the seizure and the force applied.  *See Cortez v. McCauley*, 478 F.3d at 1133 (Hartz, H., concurring in part and dissenting in part); *see also id.* at 1145 n.13 (Gorsuch, N., concurring in part and dissenting in part).  Although this approach may more holistically weigh the totality of the circumstances, the Tenth Circuit, as well as other circuits, currently requires separate analyses.  *See id.* ("While there is much to commend that approach, for now at least that has not been the direction followed by the circuit courts . . . .").

Even so, courts evaluate the use of force "from the perspective of a reasonable officer on the scene, recognizing" that officers must, in some circumstances, "make split-second judgments under stressful and dangerous conditions."  *Holland*, 268 F.3d at 1188 (internal quotation marks omitted).  Force is not unreasonable merely where less intrusive means could have, in hindsight, adequately addressed safety concerns.  *United States v. Sharpe*, 470 U.S. 675, 687 (1985).  Instead, qualified immunity protects "officers from the sometimes hazy border between excessive and acceptable force, and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  *Holland*, 268 F.3d at 1196 (10th Cir. 2001).

      1.  APD Detectives violated no clearly established precedent in ordering and conducting the VBM.

The reasonableness analysis applies both to immediate decisions made while conducting the seizure and to "conduct immediately connected with the seizure, such as police conduct arguably creating the need for force . . . ."  *Holland*, 268 F.3d at 1189 (internal quotation marks omitted).  For example, in *Holland*, the court concluded that the police officer's decision to deploy a SWAT team to a house with several innocent occupants, including children, to execute a warrant was subject to the reasonableness analysis because that decision "largely determine[d] how the seizure [would be] carried out, thereby determining the extent of the" occupants' Fourth Amendment rights.  *Id.* at 1190.  There, the court determined that the decision to employ the tactic was reasonable, even though the arrest warrant was for misdemeanor assault and reckless endangerment charges, the suspect had no criminal record, and the officers had no reason to believe that the suspect would physically resist arrest.  *Id.* at 1191.

Although the court in *Holland* determined that the tactical decision to deploy a SWAT team was not excessive force, the court held that the SWAT team officers applied excessive force when they continued to hold young residents at gunpoint after the officers had gained

complete control of the situation.  *Holland*, 268 F.3d at 1193.  In conducting the raid, the SWAT team encountered three "young men" playing basketball, aged 24, 18, and eight, and a found a 14 year-old boy elsewhere on the property.  *Id.* at 1183–84.  The officers pointed firearms at the boys, ordered them to lie face down on the ground, and continued pointing firearms at them until after they complied, for as long as ten minutes.  *Id.*  The court determined that while the initial show of force may have been necessary to gain "immediate and unquestioned control[,] . . . . justification for continuing to hold the young people directly at gunpoint simply evaporated" once the officers gained control.  *Id.* at 1197; *see also Maresca*, 804 F.3d at 1314 (determining a genuine dispute of material fact existed where the parties disagreed whether "the officers continued to hold minors at gunpoint after they had been subdued").  Such a threat of force required "a perceived risk of injury or danger to the officers or others, based upon what the officers knew at the time[,]" and no such justification existed.  *Holland*, 268 F.3d at 1192.

As in *Holland*, this Court must evaluate both the decision to use an apprehension tactic and the execution of that tactic.  No directly on point Supreme Court or Tenth Circuit cases examine the force applied in VBMs, especially the unique aspect of trapping a stopped vehicle through physical contact from undercover vehicles.  However, such a tactic is likely less invasive than the SWAT raid deployed in *Holland*.  APD Detectives here, unlike the SWAT team in *Holland*, were unaware that a minor would be present in the Camaro when they decided to initiate a VBM.  Even if APD Detectives had been aware that Ms. Torres was 16, the use of force for the limited period until they established control over the situation, like the authorization of the home raid in *Holland*, was reasonable.  *See Holland*, 268 F.3d at 1189.  Perhaps APD Detectives could have made a different decision, for example to apprehend Mr. Marquez at home, wait until the roads were not wet, or initiate the VBM in a different area.  Reasonableness,

however, does not require the least intrusive use of force possible. *Sharpe*, 470 U.S. at 687. While the decision to use a VBM likely did not violate Ms. Torres's rights, APD Detectives certainly did not violate clearly established precedent in deciding to conduct the VBM.

Unlike in *Holland*, APD Detectives also reasonably conducted the VBM, limiting their use of the VBM and firearms to establish control over the situation. Ms. Torres complained of no injuries from the actual vehicle stop. APD Detectives pointed their firearms at the Camaro and Ms. Torres for no more than three minutes. (*See* Doc. 49; Ex. G at 15:33:27–36:20.) Although APD Detectives pointed their firearms at the vehicle, there is no evidence that they pointed firearms directly at Ms. Torres. (*See* Doc. 58 at 5–11, ¶ L.) Once the Camaro was cleared, APD Detectives lowered their weapons. (Doc. 58-8 at 8.) Undisputedly, unlike in *Holland* and *Maresca*, APD Detectives lowered their firearms and removed Ms. Torres's handcuffs after the individuals had been subdued. Consequently, this key "genuine dispute" noted in *Maresca* does not apply here. *See Maresca*, 804 F.3d at 1314. As long as the actual decision to deploy the VBM did not violate Ms. Torres's rights, APD Detectives applied reasonable force in executing the VBM. If the decision to use the VBM violated Ms. Torres's rights, the APD Detectives did not violate clearly established precedent in executing it.

2.   None of the APD Detectives named in this case handcuffed Ms. Torres.

The decision to handcuff an individual is also subject to the reasonableness analysis. *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009). "Unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight." *Cortez*, 478 F.3d at 1129. Courts will also consider other factors, such as prolonged duration, potential to aggravate other conditions, and level of cooperation. *Fisher*, 584 F.3d at 894. However, personal liability is individual, based on each officer's

23

actions and omissions.  *See Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281, 1285 (10th Cir. 2007) (discussing officer liability individually and finding an officer liable both for his actions and his failure to stop other officers' actions).

Here, none of the named APD Detectives handcuffed Ms. Torres.  (Doc. 58-6 at 8.)  Ms. Torres was handcuffed for two minutes and seven seconds (*see* Doc. 49; Ex. G at 15:34:54– 15:37:01), and she does not assert that she complained to any of the APD Detectives that the handcuffs were too tight while she was handcuffed.  APD Detectives had no time or reason to consider whether the handcuffs were too tight.  Consequently, APD Detectives did not use excessive force or unreasonably fail to stop another officer from using excessive force by failing to loosen the handcuffs.

### C.  Section 1983 Claims Against Albuquerque

In limited circumstances, municipalities may be held liable in § 1983 Claims.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  However, municipalities are not subject to liability "*solely* because [a municipality] employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Id.*  Instead, "[a] plaintiff suing a municipality under section 1983 for the acts of one of its employees must prove: (1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation."  *Myers v. Oklahoma Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998).

#### i.  *Civil Rights Violation*

Indisputably, "[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers."  *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993).  As determined *supra* at III(B), and for the foregoing reasons, no underlying violation exists here.

24

First, the APD Detectives were justified in seizing the occupants of the Camaro to arrest Mr. Marquez.  *See supra* at (III)(B)(ii)(a).  The method of the seizure, a VBM, was reasonable because it was "carefully tailored to its underlying justification" to arrest Mr. Marquez.  *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997).  APD Detectives had "reason to be concerned for their safety," *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993), based on Mr. Marquez's gang affiliation, *see Muehler v. Mena*, 544 U.S. 93, 100 (2005), habit of carrying a gun, and plans to flee the city.  (Doc. 48-1 at 5.)  Because, APD Detectives had reasonable suspicion that at least one of the occupants was armed and dangerous, *see United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir. 1982), they took "reasonable steps to protect themselves."  *Perdue*, 8 F.3d at 1463.  Since the public and individual safety was at risk during the apprehension of Mr. Marquez, Ms. Torres's detention was a seizure, not an arrest.  *See id.* at 1274.  The APD Detectives also had reasonable suspicion to detain Ms. Torres while arresting Mr. Marquez.  *See United States v. Lang*, 81 F.3d 955, 965 (10th Cir. 1996) (holding that an investigatory stop was justified where police detained two occupants because they believed the passenger was a suspect for two robberies and a robbery/murder); *see also United States v. Helton*, 232 F. App'x 747, 750 (10th Cir. 2007) (determining that a police traffic stop was reasonable where police believed the passenger had a warrant for her arrest).  Consequently, the seizure did not violate Ms. Torres's constitutional rights.

Second, APD Detectives did not use excessive force in detaining Ms. Torres through use of a VBM.  *See supra* at III(B)(iii)(b)(1).  The decision to conduct a VBM was likely less invasive than the decision upheld in *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1190–91 (10th Cir. 2001), even though warrants for Mr. Marquez were for more serious crimes than the suspect in *Holland*.  Moreover, there was reason to believe that Mr. Marquez would

attempt to evade arrest by flight.   (Doc. 48-1 at 5.)   Consequently, APD Detectives were reasonable in planning a VBM.   The VBM was also executed reasonably.   Ms. Torres complained of no injuries from the actual vehicle stop.   Unlike *Holland*, the use of firearms was also reasonable, because APD Detectives limited use to establish control over the situation.   *See Holland*, 268 F.3d at 1189; *see also Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1314 (determining a genuine dispute of material fact existed where the parties disagreed whether "the officers continued to hold minors at gunpoint after they had been subdued").

Although not determined above, *see supra* at III(B)(iii)(b)(2), the handcuffing of Ms. Torres was also reasonable.   The *Graham* factors also apply to handcuffing.   *Fisher v. City of Las Cruces*, 584 F.3d 888, 894–96 (10th Cir. 2009).   Handcuffing may be "an appropriate response to officer-safety concerns even during investigative detentions.   But the justifiable initial use of handcuffs can become unreasonable if other factors, such as prolonged duration, 'affect the balance of interests under *Graham*.' " *Id.* (quoting *Muehler*, 544 U.S. at 100) (determining excessive force where a police officer placed pressure on a gunshot wound to handcuff a severely wounded suspect despite his objections).   "Unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight."   *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007).

Here, one *Graham* factor, as well as other considerations, weigh strongly in favor of Albuquerque.   Although APD Detectives did not believe Ms. Torres had committed a crime (Doc. 65-1 at 5; 65-3 at 8), they knew they were dealing with an occupant of a car that also contained a violent felony suspect who was likely to be armed and dangerous.   (Doc. 48-1 at 5.) They also had reason to be concerned about officer and public safety because of Mr. Marquez's

gang affiliations.  "In such inherently dangerous situations, the use of handcuffs minimizes the risk of harm to both officers and occupants."  *Muehler*, 544 U.S. at 100.  Although Ms. Torres was compliant, the risk was higher here than in *Fischer*, because she was not wounded.  *See Fisher*, 584 F.3d at 895.  Moreover, Ms. Torres was handcuffed for only two minutes and seven seconds (*see* Doc. 49; Ex. G at 15:33:41–15:37:01), until Detective Hernandez determined that she was not a threat to the safety of others.  Ms. Torres did not complain to Detective Hernandez, while she was handcuffed, that the handcuffs were too tight.  (*See id.*)  Detective Hernandez thus did not ignore timely complaints regarding the tightness.  Detective Hernandez had no time or reason to consider whether the handcuffs were too tight.  Consequently Detective Hernandez did not use excessive force in handcuffing Ms. Torres.

Based on the above reasoning, Albuquerque has carried its burden in showing no genuine issue of material fact, and is consequently entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  Even so, the Court recognizes that the decision to conduct a VBM, including intentional contact with the target car, firearms trained on the target car, and handcuffing all occupants, certainly presents a close call for non-suspects who are minors.  The decision here hinges on Mr. Marquez's violent felony warrants and the likelihood that he would be armed, as well as the short duration of the handcuffing and APD Detectives' and Detective Hernandez's efforts to avoid an intrusion of dignity.  In circumstances without these considerations, a constitutional violation could have occurred.

### ii.    *Moving Force*

If the decision to implement a VBM in this case did constitute excessive force, Albuquerque is still not liable, because it did not enact policy or maintain deficient training that, "in a causal sense, reflect[ed] deliberate indifference to the constitutional rights of" Ms. Torres.

27

*D.T. by M.T. v. Indep. Sch. Dist. No. 16 of Pawnee Cty., Okla.*, 894 F.2d 1176, 1193 (10th Cir. 1990).

A municipality may be liable even if its employees are protected by qualified immunity where the employees violated an individual's constitutional rights but "were entitled to immunity because they acted reasonably in light of existing law." *Myers v. Oklahoma Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998). In such cases, a plaintiff must show "that a municipal policy or custom was the moving force behind the constitutional deprivation." *Id.* at 1316. "In later cases, the Supreme Court [also] required a plaintiff to show that the policy [or custom] was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). A policy or custom is a "formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Id.* at 770.

> a. *The Policy did not cause the constitutional violation nor was it implemented with deliberate indifference.*

To establish that the municipality's action was the moving force behind the violation, the plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). "When the execution of municipal policy does not compel a constitutional violation[,] . . . the causal connection between municipal policy and the deprivation of constitutional rights becomes more difficult to discern." *D.T. by M.T.*, 894 F.2d at 1188 (internal quotation marks omitted). Indeed, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation

must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cty. Comm'rs of Bryan Cty., Okla.*, 520 U.S. at 405.

Relatedly, "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bd. of Cty. Comm'rs of Bryan Cty., Okla.*, 520 U.S. at 407. Deliberate indifference occurs where a municipality consciously disregards "actual or constructive notice that action or failure to act is substantially certain to result in a constitutional violation . . . ." *Schneider*, 717 F.3d at 771.

In *Whitewater v. Goss*, 192 F. App'x 794 (10th Cir. 2006), the court considered a departmental policy that required "SWAT-team members to secure at gunpoint all occupants, including juveniles, until the residence ha[d] been secured." *Id.* at 798. Although that policy was constitutional, the plaintiff argued that "the policy caused the violation because [a minor] was held at gunpoint for an unreasonable length of time." *Id.* The court, however, disagreed, determining that "[a] commonsense interpretation of this policy would not authorize an officer to hold a 12-year-old at gunpoint for 15 minutes without reasonable grounds to do so." *Id.*

Here, the policy did not require APD Detectives to conduct a VBM to apprehend Mr. Marquez while Ms. Torres was in the car. Consequently, a causal connection is more difficult to discern and the standards are more rigorous. *See D.T. by M.T.*, 894 F.2d at 1188; *Bd. of Cty. Comm'rs of Bryan Cty.*, 520 U.S. at 405. The policy complies with the *Graham* test of reasonableness, requiring detectives to the pay careful attention to the "facts and circumstances of each particular case . . . ." *See Graham v. Connor*, 490 U.S. 386, 396 (1989); (Doc. 50-1 at 1). Albuquerque requires detectives not only to consider the *Graham* factors, "the severity of the

crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," but also other safety issues such as environmental conditions, the presence of children, and alternate methods of apprehension.  (Doc. 50-1 at 1.)  The policy also limits detectives who can use VBMs to detectives who receive training and practice.  (*Id.* at 2.)  Nothing in this policy caused APD Detectives to conduct the VBM at that time, while Ms. Torres was a passenger and Mr. Marquez was not driving.  Even considering the presence of a teenager in the car and a non-suspect driver, APD Detectives may have determined that Mr. Marquez's likelihood of being armed and dangerous, gang affiliation, and plans to flee outweighed these considerations in the totality of circumstances.  Indeed, a commonsense interpretation of this policy would not authorize a VBM before considering whether it was reasonable based on the circumstances and whether there were safer, alternate means of apprehension.

Similarly, Albuquerque was not deliberately indifferent.  Given the unclear legal ground, Albuquerque could not have had constructive notice that failure to include policy on VBMs with non-suspect occupants "was substantially certain to result in a constitutional violation." *Schneider*, 717 F.3d at 771; *see also Merritt*, 695 F.2d at 1272 (determining reasonable investigatory seizure of suspect "and his companions" at gunpoint); *Maresca*, 804 F.3d at 1309 (determining arrest where the detention lasted at least seven minutes and plaintiffs were forced to lie prone on the highway and then locked in patrol cars).  Instead, Albuquerque had no reason to believe that failure to list other considerations beyond the *Graham* factors, such as the age of children, presence of non-suspects, and non-suspect drivers, would with substantial certainty cause a constitutional violation.  Albuquerque policy required "specific training and practice" and limited VBMs to narrow circumstances.  (Doc. 50-1 at 2.)  Indeed, in instructing detectives

to consider the "facts and circumstances of each case," Albuquerque had no reason to anticipate that detectives would fail to consider other occupants in the vehicle.

      *b. The training was not implemented with deliberate indifference and did not cause the violation.*

      Failure to train or inadequate training requires that a plaintiff show:

      (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Allen v. Muskogee, Okla.*, 119 F.3d 837, 841 (10th Cir. 1997) (inadequate training); *Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000) (failure to train).   To establish deliberate indifference, a plaintiff must ordinarily show "[a] pattern of similar constitutional violations" by employees.  *Bd. of Cty. Comm'rs of Bryan Cty.,* 520 U.S. at 409.  Municipalities must have "notice that a course of training is deficient in a particular respect, [otherwise] decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Connick v. Thompson*, 563 U.S. 51, 62–63 (2011) (determining that past *Brady* violations were not sufficiently similar to put the defendant on notice because the past violations did not involve "disclosure of blood evidence, a crime lab report, or physical or scientific evidence of any kind").

      In rare circumstances, "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability."  *Bd. of Cty. Comm'rs of Bryan Cty., Okla.*, 520 U.S. 397, 409 (1997).  However, proof "that an injury or accident could have been avoided if an officer had had better or more training" is insufficient to

establish an obvious risk of violation.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989); *see also Connick,* 563 U.S. at 68 ("[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.").  Indeed, "[s]uch a claim could be made about almost any encounter resulting in injury . . . ."  *City of Canton, Ohio*, 489 U.S. at 391.

Instead, courts require evidence that the situation is recurring, that the potential for violation is obvious, and that the municipalities could have identified specific tools to handle that situation.  *See Bd. of Cty. Comm'rs of Bryan Cty., Okla*, 520 U.S. at 409.  In *Sperry v. Maes*, 592 F. App'x 688, 698 (10th Cir. 2014) *cert. denied,* 136 S. Ct. 44 (2015), the court denied a failure to train claim because the town could not have had notice based in part on "the dearth of case law" on the claimed constitutional violation.  Many cases rely on experts to establish obvious potential violations based on standard practices in other jurisdictions.  *Compare Allen*, 119 F.3d at 843 (denying summary judgment for county where expert testified that training was "out of synch with the rest of the country in the police profession") *with Whitewater v. Goss*, 192 F. App'x 794, 799 (10th Cir. 2006) (granting summary judgment to county and noting that, unlike the expert evidence in *Allen*, 119 F.3d at 843 "[t]he evidence here establishes only that the [police officers] *were* trained, and no evidence was presented that the training was deficient under prevailing norms").  Such evidence would make a constitutional violation the "obvious consequence" of failure to conform.  Only in these "highly predictable situations," will a court allow claims without a pattern of violations.  *Bd. of Cty. Comm'rs of Bryan Cty., Okla*, 520 U.S. at 409.

In her complaint, Ms. Torres alleges that Albuquerque "has trained its officers and has implemented a policy of transforming an arrest of a person who has a warrant into invasive

seizures which unjustifiably impact and injure civilians." (Doc. 1-1 at 8.) Albuquerque claims that this allegation does not assert failure to train or inadequate training, but rather "flawed" training, and consequently asserts that *Meade v. Grubbs*, 841 F.2d 1512 (10th Cir. 1988) applies instead of *Allen*, 119 F.3d 837. (Doc. 50 at 8.) Ms. Torres's response, however, identifies "deficiencies" and "inadequacies" in Albuquerque's training program (Doc. 65 at 15) and "fail[ure] to train" for other circumstances (*id.* at 16). Clearly, if a training program includes unconstitutional guidance, it is "inadequate" in that it fails to include adequate, correct guidance. *See Allen*, 119 F.3d at 843 ("[I]f the officers were trained to respond to this kind of call by staying in the open, leaving innocent people in the open, and doing provocative things like trying to grab the gun and get into the car, the training was "out of synch with the entire United States in terms of what police are being trained to do."). Moreover, interpreting Ms. Torres's claim to allege inadequate training does not prejudice Albuquerque. A claim for inadequate training relies on the same factual arguments, *see Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1122 (10th Cir. 2005), as "flawed" training, and indeed requires a stiffer standard than the gross negligence standard identified in *Meade*, 841 F.2d at 1528. *See City of Canton, Ohio*, 489 U.S. at 388, n.7 (holding that, although some circuits previously used the "gross negligence" standard, plaintiffs must instead show deliberate indifference).

Assuming, arguendo, that APD Detectives exceeded constitutional limitations on the use of force, Ms. Torres establishes the first two requirements of the *Allen* inadequate training test. In addition to the constitutional violation, "[t]he use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal." *See Allen*, 119 F.3d at 841, 842 (determining a usual and recurring situation existed where officers commonly had to deal with mentally ill people under the influence of drugs). As evidenced by the

detective's statements and the VBM Report forms, VBMs were a regular occurrence.  (Docs. 58-3 at 4; 58-6; 65-7; 65-8.)  Indeed, the Gang Unit initiated at least two VBMs that same year to apprehend a subject with a felony warrant while other passengers were in the car.  (*Id.*)  *See also Allen*, 119 F.3d at 842.  As such, Ms. Torres meets her burden to establish the first two requirements for municipal liability for inadequate training.

However, no evidence indicates a "pattern of similar constitutional violations."  *Bd. of Cty. Comm'rs of Bryan Cty.,* 520 U.S. at 409.  The record indicates that one of the APD Detectives had previously been deposed for "another VBM lawsuit several years ago."  (Doc. 58-6 at 6.)  However, Ms. Torres presents no information about the circumstances of the incident, the claims of the lawsuit, or any result.  As such, there is no evidence that the circumstances were sufficiently similar or that the same training could have addressed this issue as well.  *See Connick*, 563 U.S. at 62 ("Those four [*Brady*] reversals could not have put [the defendant] on notice that the office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here.").  Ms. Torres identifies multiple incidents where the Gang Unit initiated VBMs to apprehend a subject with a felony warrant while other passengers were in the car (Doc. 65-8). Even so, Ms. Torres provides no evidence that the specific circumstances of those VBMs resulted in constitutional violations and that if constitutional violations occurred, they were sufficiently similar to the one alleged here.  There is no evidence that either incident included a minor, that the VBMs occurred near one of the non-suspects' schools, that a non-suspect was driving the vehicle, or that non-suspects were handcuffed.  Without this information, it is impossible for the Court to determine that Albuquerque had notice that their VBM training was deficient "in a particular respect" relating to the totality of circumstances that cause

constitutional violations.  *See Connick*, 563 U.S. at 62.  Consequently, a pattern does not exist to establish that Albuquerque was deliberately indifferent in its training program.

Moreover, Ms. Torres has proffered no evidence beyond this single violation to show "obvious potential" for a violation.  *Bd. of Cty. Comm'rs of Bryan Cty., Okla.*, 520 U.S. at 409. Ms. Torres argues that discrepancies in APD Detectives' understanding of the definition of a "child" and the distinction between "hard blocks" and "soft blocks" is sufficient additional evidence to show that a potential violation was obvious.  (Doc. 65 at 14–16.)  However, such deficiencies in understanding show, at most, proof that training could have better helped APD Detectives make difficult decisions as to whether to initiate the VBM and what kind of VBM to initiate in this circumstance.  *See Connick,* 563 U.S. at 68.  Such evidence does not establish an obvious risk of violation.  *Id.*  Moreover, the "dearth of case law," *Sperry*, 592 F. App'x at 698, could not have put Albuquerque on notice that potential for a violation was obvious.  Further, notably absent from Ms. Torres's claim are any assertions that Albuquerque's training program is deficient compared to national norms.  *Compare Allen*, 119 F.3d at 843 *with Whitewater*, 192 F. App'x at 799.  Consequently, Ms. Torres provides no evidence to show that a violation was "highly predictable" in this context.  *See Bd. of Cty. Comm'rs of Bryan Cty., Okla*, 520 U.S. at 409.  Ms. Torres's claim for inadequate training presents no genuine issue of material fact and Albuquerque is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).

### D.  State Law Claims

28 U.S.C. § 1367(c)(3) provides that district courts may dismiss pendant state claims where the court has dismissed all claims over which the court has original jurisdiction.  Indeed, if a federal court dismisses all federal claims before trial, the court should generally "decline the exercise of jurisdiction by dismissing the state claims without prejudice."  *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010).  Courts decline such jurisdiction because "[n]otions of

comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Id.* at 1230; *see also Lord v. Hall*, 520 F. App'x 687, 693–94 (10th Cir. 2013) (affirming district court's dismissal of unlawful seizure and arrest and excessive force claims but remanding for dismissal of state assault and battery claims without prejudice). Since the Court grants summary judgment for Counts I, II, and III and all non-state claims alleged in Count V, the Court will dismiss all claims over which it had original jurisdiction. Therefore, this Court will dismiss Ms. Torres's state claims without prejudice.

### E.  Separate Trials

Since the Court dismisses all claims, Defendants' Motion for Separate Trials (Doc. 51) is moot.

## IV.    CONCLUSION

APD Detectives are immune from Ms. Torres's § 1983 claims. Considering the facts in the light most favorable to Ms. Torres, APD Detectives reasonably detained Ms. Torres to ensure public and officer safety while arresting Mr. Marquez. APD Detectives are also entitled to qualified immunity against Ms. Torres's claim for excessive force, because they violated no clearly established precedent by ordering and implementing a VBM to detain a vehicle with multiple occupants, one of whom was suspected to be armed and dangerous. Albuquerque is also not liable under § 1983. If a violation occurred, Albuquerque's policy that detectives consider individual circumstances of each case, including the *Graham* factors, did not cause the violation and Albuquerque did not enact its policy with deliberate indifference. Moreover, Albuquerque was not deliberately indifferent in its training because there was no pattern of violations and there was no obvious potential for a violation. Since the Court will grant summary judgment for all federal question claims, the Court will dismiss the pendant state claims without

prejudice.  Since the Court dismisses claims, the Court also denies Defendants' Motion for Separate Trials.

**THEREFORE**,

**IT IS ORDERED** that

(1) APD Detectives' Motion to Dismiss (Doc. 48) is **GRANTED** for Count I, Unreasonable Seizure, Count II, Excessive Force, and Count III, Unreasonable Detention.  Count IV, Assault, Battery, and False Imprisonment, is **DISMISSED** without prejudice.

(2) Albuquerque's Motion to Dismiss (Doc. 50) is **GRANTED** as to claims for unreasonable seizure, excessive force, and unreasonable detention.  Claims against Albuquerque for assault, battery, and false imprisonment are **DISMISSED** without prejudice.

(3) Defendants' Motion for Separate Trials (Doc. 51) is **DENIED**.


**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**